

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

| | | | |
|---|---|---|---|
| *Matthew J. Maddox*<br>*Assistant United States Attorney*<br>*matthew.maddox2@usdoj.gov*<br>**JTM** 12.2.21 | *Mailing Address:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *Office Location:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *DIRECT: 410-209-4940*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-0716* |

December 2, 2021

VIA E-MAIL

Courtney D. Francik
Assistant Federal Public Defender
Office of the Federal Public Defender
for the District of Maryland
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201

FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

JAN 2 1 2022

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

Re:     Underline United States v. Sesseiu Ange Oulai, Crim. No. ELH-21-0114

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Sesseiu Ange Oulai (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **December 8, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

## Offense(s) of Conviction

1.     The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Conspiracy to Commit Wire Fraud Affecting Financial Institutions, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

## Elements of the Offense(s)

2.     The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland,

Rev. May 2018

a.  two or more persons agreed to try to accomplish a common and unlawful plan to commit a fraud crime listed in Title 18 Chapter 63, as charged in the Indictment—that is,

b.  transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing a scheme or artifice to defraud,

c.  having devised or intended to devise the scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, and

d.  affecting a federally insured financial institution; and

e.  the Defendant knew the unlawful purpose of the plan and willfully joined it.

<u>Penalties</u>

3.     The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | 30 years | 5 years | $1,000,000 | $100 |

a.     Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.     Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.     Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.     Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e.     Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

Rev. August 2018

2

f.    Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4.    The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.    If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.    If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.    If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.    The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.    If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of

Rev. August 2018

3

evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

        5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551 through 3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

        6.      This Office and the Defendant stipulate and agree to the Stipulation of Facts set forth in Attachment A, which is incorporated by reference herein.

Rev. August 2018

      a.     This Office and the Defendant agree that the offense of conviction and relevant conduct described in Attachment A group pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2.

      b.     The parties further agree that the applicable base offense level is **7** pursuant to U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1).

      c.     The parties further agree that there is an increase of **14 levels**, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the loss exceeded $550,000 but did not exceed $1,500,000. (Subtotal: 21)

      d.     The parties further agree that there is an increase of **2 levels**, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims.  (Subtotal: 23)

      e.     The parties further agree that there is an increase of **2 levels**, pursuant to U.S.S.G. § 2B1.1(b)(10), because a substantial part of a fraudulent scheme was committed from outside the United States.  (Subtotal: 25)

      f.     This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's affirmative acceptance of personal responsibility for the Defendant's criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty.  This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

      g.     Thus, the parties anticipate a final offense level of **22**.

     7.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

     8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Rev. August 2018

## Obligations of the Parties

9.      At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

11.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the parties agree total at least $219,203 and not greater than $300,000. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the

Rev. August 2018

6

probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

Forfeiture

12.     The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in anything that constitutes money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including a money judgment in the amount of proceeds the Defendant obtained from his illegal activities.

14.     The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15.     The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Rev. August 2018

Abandonment

17.    The Defendant knowingly and voluntarily waives any and all of the Defendant's right, title, and interest in the following items seized by Baltimore County Police Department on or about December 28, 2020 (the "Abandoned Property") and consents to its federal administrative disposition, official use, and/or destruction:

    a.   an Apple iPhone; and
    b.   a Lacie portable hard drive.

18.    The Defendant understands that he would have a right to file a claim to the Abandoned Property. The Defendant agrees not to contest the vesting of title of the Abandoned Property in the United States Government and agrees to unconditionally release and hold harmless the United States Government, its officers, employees, and agents, from any and all claims, demands, damages, causes of actions, suits, of whatever kind and description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or affecting, directly or indirectly, the seizure or waiver of ownership interest in the Abandoned Property.    The Defendant agrees to execute any documents as necessary to the waiver of right, title and interest in the Abandoned Property, including any forms necessary to effect the Defendant's waiver of ownership interest.

Defendant's Conduct Prior to Sentencing and Breach

19.    Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

20.    If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement.  In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

Rev. August 2018

8

Court Not a Party

21.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

22.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Matthew J. Maddox
Darryl L. Tarver
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

12/14/2021
Date

Sessieu Ange Oulai

Rev. August 2018

9

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

12/15/21
Date

*Courtney D. Francik*
Courtney D. Francik, Esq.

**Rev. August 2018**

10

**ATTACHMENT A**

**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

35  SAO

The defendant Sessieu Ange Oulai (the "Defendant"), age 25, is a resident of Maryland.

CDF  DLT

## I.   Business Email Compromise Scheme (2016-2018)

Between August 2016 and December 2018, the Defendant conspired and agreed with others, including Conspirator A and Conspirator B, to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises (the "fraud scheme"), and to transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, e-mails, text and multimedia messages, electronic transfers of money, and other signals for the purpose of executing the fraud scheme.

Members of the conspiracy conducted business e-mail compromise ("BEC") scams targeting individuals and companies who were engaged in financial transactions and/or ongoing business relationships with other individuals or entities. Specifically, members of the conspiracy used false and fraudulent e-mails to deceive these victims by impersonating clients, persons in positions of authority, and representatives of companies with whom the victims had ongoing business. Through these false and fraudulent e-mails, the conspirators induced the victims to send money via electronic transfer or deposit into bank accounts controlled by the Defendant and other conspirators. In this way, the Defendant and other members of the conspiracy intercepted payments intended for others. The Defendant and his co-conspirators opened and controlled accounts with federally insured financial institutions ("drop accounts") for the purpose of receiving proceeds of the fraud scheme from their victims and communicated with one another by text and multimedia message about the drop accounts and fraud proceeds.

The Defendant also conspired with others, including Conspirator A and Conspirator B, to launder proceeds of the fraud scheme by conducting monetary and financial transactions in fraud proceeds in order to disguise the nature, location, source, ownership, and control of the proceeds, and to promote the fraud scheme through payments to participants in the scheme.

The Defendant willfully joined and participated in the fraud and money laundering conspiracies aware of their unlawful purposes, aware that they affected federally insured financial institutions, and aware that the money laundering transactions involved proceeds of the fraud scheme. The deposits of the affected banks (including Bank of America and others) were insured by the Federal Deposit Insurance Corporation. The Defendant joined and participated in the fraud and money laundering conspiracies in the District of Maryland and elsewhere.

Rev. August 2018

1

Losses in the amounts described below were either known and intended or reasonably foreseeable to the Defendant.

### A. BEC Scams Against Business E and S.I.

Business E was a furniture distributor based in Florida.

On August 26, 2016, members of the fraud conspiracy sent e-mails to a controller of Business E in which they falsely impersonated an owner of Business E. The fraudulent e-mails instructed and caused the controller of Business E to complete and authorize a wire transfer in the approximate amount of $32,440 to a drop account at Bank of America ending in x9149 held by G.B., a close associate of the Defendant.

Between August 27, 2016, and August 29, 2016, Conspirator A sent text messages to the Defendant directing him to use funds from Bank of America account x9149 to send cash to, and make cashier's checks payable to, other persons. The Defendant caused two cashier's checks to be purchased totaling $24,000 and a cash withdrawal of $7,000 from account x9149 on August 29, 2016. The Defendant caused transfers of funds totaling $6,275 from account x9149 to another account held by G.B. on August 30, 2016.

On the same date, members of the fraud conspiracy caused Bank of New York Mellon to complete a wire transfer in the approximate amount of $70,650 from victim S.I.'s financial account, based in Switzerland, to Bank of America account x9149 under false pretenses. Between August 30, 2016, and September 12, 2016, the Defendant and Conspirator A exchanged text messages regarding the balance in account x9149, whether money deposited into the account has been held or frozen, the closure of the account by Bank of America, and how to resolve the problem.

### B. BEC Scam Against Business G

Business G was a financial advisory firm based in Pennsylvania.

On April 28, 2017, members of the fraud conspiracy sent e-mails to a representative of Business G in which they falsely impersonated a client of the firm and requested Business G to complete a wire transfer to a drop account opened in Baltimore, Maryland and controlled by a member of the conspiracy. On May 1, 2017, members of the conspiracy submitted a wire authorization letter to Business G in the client's name, ordering and causing a wire transfer in the approximate amount of $85,500 from a financial account held by the client to the conspirator's drop account. On May 2, 2017, ~~the Defendant requested payment from Conspirator A, and~~ *GAO* Conspirator A instructed another co-conspirator to make a cashier's check payable to the Defendant for $60,000 from money deposited into the drop account. *CDF*

### C. BEC Scam Against Business I

Business I was an investment firm based in New Jersey.

Rev. August 2018

On May 11, 2017, and May 15, 2017, members of the fraud conspiracy sent e-mails to a representative of Business I in which they falsely impersonated a client of the firm. Fraudulent e-mails sent on May 15, 2017, requested and caused Business I to complete a wire transfer in the approximate amount of $150,000 to a drop account controlled by a member of the conspiracy.

On May 15, 2017, the Defendant and Conspirator A discussed the balance in the drop account via text message. Between May 15, 2017, and May 16, 2017, Conspirator A caused another member of the conspiracy to purchase a cashier's check made payable to the Defendant using money deposited into the drop account by Business I. The cashier's check was made in the approximate amount of $50,000 and deposited into an account controlled by the Defendant. On May 30, 2017, the Defendant purchased an official check made payable to a co-conspirator in the approximate amount of $50,000, which was derived from money obtained from Business I under false pretenses.

### D. BEC Scam Against Business J, K.C., and J.C.

Business J was a real estate title company based in Florida, and K.C. and J.C. were clients of Business J.

Between September 18, 2017, and September 19, 2017, members of the fraud conspiracy sent e-mails to K.C. and J.C. in which they falsely impersonated a representative of Business J. The fraudulent e-mails instructed and caused K.C. and J.C. to complete a wire transfer in the approximate amount of $228,253 to a drop account opened in Maryland and controlled by the Defendant.

On September 20, 2017, Conspirator B sent the Defendant the names of K.C. and J.C., information about the $228,253 wire transfer, and an image of e-mails exchanged between K.C. and conspirators impersonating a representative of Business J. Conspirator B instructed the Defendant to use money deposited into the drop account by K.C. and J.C. to purchase cashier's checks. On the same date, the Defendant used fraud proceeds to purchase cashier's checks totaling approximately $93,208 and to make cash withdrawals totaling approximately $11,000.

### E. BEC Scams Against Business K and Business L

Business K was a food service distribution company based in Ohio, and Business L was a food products distribution company based in Missouri.

Between August 28, 2018, and September 5, 2018, members of the fraud conspiracy sent e-mails to the owner of Business K in which they falsely impersonated a representative of Business L. These fraudulent e-mails requested and caused Business K to complete a wire transfer in the approximate amount of $43,896 to a drop account at Hamilton Bank opened in Baltimore, Maryland controlled by the Defendant.

Between September 5, 2018, and September 7, 2018, the Defendant used money deposited into the drop account by Business K to make cash withdrawals in Maryland totaling at least approximately $27,720.

### F. BEC Scam Against Business M

Rev. August 2018

3

Business M was a manufacturing company based in Texas.

On December 6, 2018, members of the fraud conspiracy sent an e-mail from outside the United States and Canada to Scotiabank, a Canadian financial institution, impersonating a controller of Business M. The e-mail ordered and caused a foreign exchange trade of $500,000 in Canadian dollars from Business M's financial account to approximately $371,885 in United States dollars and payment of this amount to a drop account opened in Maryland and controlled by the Defendant. Between December 7, 2018, and December 10, 2018, most of the money deposited into the drop account under false pretenses was withdrawn through cash withdrawals, transfers to other accounts, and checks, leaving $85,121 to be returned to Scotiabank upon Business M's discovery of the fraud.

## II.    Unemployment Benefit Fraud Scheme (2020)

Between July 2020, and September 2020, the Defendant conspired with other persons, including Conspirator C, to devise and execute a fraud scheme to obtain unemployment benefits by fraudulent pretenses and representations. In executing the fraud scheme, the Defendant and his co-conspirators knowingly and willfully caused unauthorized access devices to be delivered by mail and trafficked in the unauthorized access devices.

Specifically, the Defendant and his co-conspirators obtained and attempted to obtain money by submitting false applications in the names of identity theft victims claiming unemployment benefits to which the Defendant and other members of the conspiracy were not entitled. Members of the conspiracy submitted these fraudulent claims for unemployment benefits through the Internet to state workforce agencies. These fraudulent applications listed individual victims' names, social security numbers, and dates of birth. As a result of these applications, the state workforce agencies would disburse benefits through debit cards issued in the victims' names and mailed to addresses provided by members of the conspiracy, including addresses in Maryland accessible to the Defendant.

Conspirator C would alert the Defendant when a debit card was expected to be delivered, the Defendant would check the mail and confirm whether he received the card. For example, on July 30, 2020, Conspirator C instructed the Defendant to check whether a card addressed to B.N. had arrived, and the Defendant responded that he would check the mail, confirmed that he received the mailing, and sent Conspirator C a photo of a mail piece from the Arizona Department of Economic Security addressed to B.N. at an address in Rosedale, Maryland accessible to the Defendant. The Department of Economic Security is the workforce agency for the State of Arizona. When Conspirator C asked if there was a card inside the mailing, the Defendant confirmed that there was and provided photos of the front and back side of a debit card issued in B.N.'s name. Conspirator C responded that he would forward the photos to his "people," who would then activate the debit card, and that Conspirator C would then send the Defendant the personal identification number ("PIN") for the card. When the Defendant asked for the card's balance, Conspirator C told the Defendant that money was not yet credited to the card and to wait for confirmation from Conspirator C's "people." Conspirator C then provided a four-digit PIN for the card, allowing the Defendant to transfer unemployment compensation funds loaded on the card to other members of the conspiracy.

On July 29, 2020, the Defendant and Conspirator C exchanged text messages discussing their respective shares of proceeds from the unemployment fraud scheme. They agreed that the Defendant would take 45%, the remaining 55% would go to Conspirator C's "people," and Conspirator C would take 5% from each of those shares.

On August 19, 2020, the Defendant confirmed that he transferred the amount owed to Conspirator C's "guy" from an unemployment benefits debit card issued in the name of L.B. On September 13, 2020, Conspirator C sent the Defendant an image of a computer screen showing that a claim for unemployment benefits had been submitted in the name of L.B. via the Internet. Conspirator C advised the Defendant that an "all new set of cards" would be mailed to the Defendant at two separate addresses the Defendant had provided for use in the scheme, which were accessible to him. The Defendant agreed to receive the fraudulently issued cards.

The Defendant also agreed with Conspirator C and others to launder fraud proceeds through electronic transfers of funds. For example, on August 3, 2020, the Defendant and Conspirator C agreed via an exchange of text messages that the Defendant would establish a CashApp account and obtain a CashApp debit card for the purpose of engaging in covert transfers of funds. On August 13, 2020, Conspirator C sent the Defendant audio messages explaining that a conspirator in Lagos, Nigeria would send money into the Defendant's CashApp account and instruct the Defendant to send a share of the proceeds to Conspirator C. Conspirator C explained that the Defendant to keep 30% of the proceeds, 40% would go to the sender of the funds, and the remaining 30% would go to several "middlemen." Conspirator C requested the Defendant's approval and front and back images of the Defendant's CashApp debit card, and the Defendant provided the images of a debit card issued in a name with initials A.J.

SO STIPULATED:

Matthew J. Maddox
Assistant United States Attorney

Sessieu Ange Oulai
Defendant

Courtney D. Francik
Counsel for Defendant

Rev. August 2018

5